No. 25-6052

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EARLY WARNING SERVICES, LLC,
*Plaintiff-Counter Defendant-Appellee,*

v.

WARREN VURL JOHNSON,
*Defendant-Counter Plaintiff-Appellant.*

On Appeal from the United States District Court
for the District of Arizona, Phoenix Division
No. 2:24-cv-01587-SMB
Hon. Susan M. Brnovich

**APPELLANT'S OPENING BRIEF**

Warren Vurl Johnson

215 E 18th St
Lawrence, KS 66044
(208) 371-1686
warrenvjohnson@gmail.com
*Appellant, Pro Se*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................1

JURISDICTIONAL STATEMENT ................................................................5

ISSUES PRESENTED...................................................................................6

STATEMENT OF THE CASE.......................................................................7

    A. Background .......................................................................................7

    B. The Preliminary Injunction and This Court's Mandate ................8

    C. The September 2025 Contempt Proceedings .................................8

    D. EWS's Discovery Disclaimer ......................................................12

    E. The Sanctions...............................................................................13

SUMMARY OF ARGUMENT ....................................................................15

ARGUMENT ..............................................................................................18

    **I. THE INJUNCTION IS LEGALLY DEFECTIVE BECAUSE THE DISTRICT COURT APPLIED THE WRONG STATUTORY STANDARD AND FAILED TO IDENTIFY ANY VALID PROTECTIVE MEASURES UNDER EITHER FEDERAL OR STATE LAW**...............................................................................18

        A. The Court Applied the Wrong Standard Under Arizona Law ..............18

        B. Even Under the DTSA, the Finding Is Unsupported ..........................23

        C. The Error Requires Vacatur..................................................................27

    **II. THE DISTRICT COURT VIOLATED THE MANDATE RULE AND JUDICIAL ESTOPPEL** ..............................................................27

i

A. The Court Enforced a General Warrant, Not a Narrow Search ............27

B. EWS Is Judicially Estopped from Seeking Broader Relief Than It Represented to This Court .......................................................................29

C. The Process of Enforcing the Mandate Compounded the Violation.....30

D. EWS Has Admitted There Are No 'EWS Documents' to Search For..34

E. The Contempt Finding Rests on a Factual Premise the Court Knew Was False .................................................................................................34

**III. THE SANCTIONS ORDER MUST BE VACATED** ............................35

A. Standard of Review ...........................................................................35

B. Paradigm Establishes a Broad, Fact-Based Duty to Nonclients ...........35

C. Johnson's Motion Applied the Three Factors to Undisputed Facts ......36

D. The District Court Never Analyzed the Three Factors — Then Imposed Sanctions ...........................................................................................37

E. The Motion Was Not 'Baseless' Under Keegan ..................................38

F. Conclusion ........................................................................................38

CONCLUSION.............................................................................................39

CERTIFICATE OF COMPLIANCE.................................................................40

CERTIFICATE OF SERVICE .........................................................................41

# TABLE OF AUTHORITIES

**Cases**

*Abrasic 90 Inc. v. Weldcote Metals, Inc.,*
  364 F. Supp. 3d 888 (N.D. Ill. 2019)..............................................................21

*Am. Title Ins. Co. v. Lacelaw Corp.,*
  861 F.2d 224 (9th Cir. 1988) .........................................................................26

*Attia v. Google LLC,*
  983 F.3d 420 (9th Cir. 2020) ....................................................................16, 22

*Califano v. Yamasaki,*
  442 U.S. 682 (1979)...................................................................................8, 28

*Calisi v. Unified Fin. Servs., LLC,*
  232 Ariz. 103 (Ct. App. 2013)........................................................................27

*Cooter & Gell v. Hartmarx Corp.,*
  496 U.S. 384 (1990).......................................................................................38

*Franko v. Mitchell,*
  158 Ariz. 391 (1988).................................................................................36, 38

*In re Itel Sec. Litig.,*
  791 F.2d 672 (9th Cir. 1986) ...........................................................................5

*In re Keegan Mgmt. Co., Sec. Litig.,*
  78 F.3d 431 (9th Cir. 1996) .......................................................18, 35, 38, 39

*Napier v. Bertram* .............................................................................................37

*New Hampshire v. Maine,*
  532 U.S. 742 (2001).......................................................................................29

*Opus Fund Servs. (USA) LLC v. Theorem Fund Servs., LLC,*
   2018 WL 1156246 (N.D. Ill. 2018) ................................................................16, 20

*Paradigm Ins. Co. v. Langerman Law Offices,*
   200 Ariz. 146 (2001)........................................................................................*passim*

*Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.,*
   No. 23-16093 (9th Cir. Aug. 12, 2025) .........................................................16, 22

*Stone v. City & County of San Francisco,*
   968 F.2d 850 (9th Cir. 1992) .................................................................................33

*Taggart v. Lorenzen,*
   587 U.S. 106 (2019)...............................................................10, 17, 23, 27, 34

*Turret Labs USA, Inc. v. CargoSprint, LLC,*
   2022 WL 701161 (2d Cir. 2022) ....................................................................16, 20

*United States v. Thrasher,*
   483 F.3d 977 (9th Cir. 2007) .........................................................................27, 29

*Yellowfin Yachts, Inc. v. Barker Boatworks, LLC,*
   898 F.3d 1279 (11th Cir. 2018) .....................................................................16, 21

*Zaldivar v. City of Los Angeles,*
   780 F.2d 823 (9th Cir. 1986) .........................................................................35, 39

**Statutes**

18 U.S.C. § 1836(b)(3)(A)(i)(I) ....................................................................................4

18 U.S.C. § 1836(c) .......................................................................................................5

18 U.S.C. § 1839(3)(A)................................................................................................18

28 U.S.C. § 1291..........................................................................................................5

28 U.S.C. § 1292(a)(1).................................................................................................5

28 U.S.C. § 1332 ............................................................................................5

A.R.S. § 44-401(4)(b) ...........................................................................18, 24, 26

**Rules**

Fed. R. App. P. 4(a)(1)(A) ..............................................................................6

Fed. R. App. P. 32(a)(5)–(6) .........................................................................40

Fed. R. App. P. 32(f) .....................................................................................40

Fed. R. Civ. P. 65(d) .................................................................................32, 33

Ninth Circuit Rule 32-1 ...............................................................................40

Arizona Ethical Rule 1.6(d)(5) .....................................................................15

Arizona Ethical Rule 1.9 ..........................................................................13, 14

**Other Authorities**

Restatement (Third) of the Law Governing Lawyers § 51(3) ........................passim

Uniform Trade Secrets Act, Official Comment..............................................19

28 U.S.C. § 1927 ...........................................................................................14

## PRELIMINARY STATEMENT

This Court authorized "a forensic search for EWS's documents, narrowly tailored in this context." [ER 160] The contempt order enforcing that mandate should be vacated for three independent reasons.

**The injunction is legally defective.** The district court collapsed the AUTSA and DTSA into a single "reasonable measures" standard, but the statutes say different things. The AUTSA requires the alleged secret to be "the subject of efforts" to maintain its secrecy — a targeted nexus between the specific secret and the protective measure. The DTSA requires only general "reasonable measures." Three federal circuits have held that generalized confidentiality infrastructure — company-wide NDAs, boilerplate handbooks, undifferentiated IT policies — cannot satisfy this standard when the plaintiff has done nothing to distinguish protection of the claimed secret from protection of ordinary corporate information. The district court's reasonable-measures finding rests on employment agreements the court refused to enforce, a SharePoint permissions structure and a read-only Excel password that restricted editing but not viewing, both designed, built, and controlled by the very employee EWS accuses of misappropriation, and a generalized annual training course that drew no distinction between the claimed secrets and ordinary corporate information. EWS never possessed or even knew the Excel password. The court expressly disclaimed any findings on EWS's contract claims.

1

EWS did have a formal trade secret designation process—one that Johnson himself designed and administered during his nine-year tenure, involving idea harvesting, a review panel, formal designations, and monetary incentive awards. The Indices were never submitted to that process. In discovery, EWS admitted that its trade secrets are designated "automatically by virtue of their content and level of confidentiality" and that "no specific individuals are responsible" for any designation. ER-382. The AUTSA does not protect information that is secret by nature. It protects information that is "the subject of efforts" to maintain its secrecy. Automatic designation is not an effort. It is the opposite of one.

**The district court violated this Court's mandate.** At the September 22, 2025 contempt hearing, the district court asked EWS's counsel the right question:

> The Court: "*Do the plaintiffs understand that when your vendor gets ahold of his equipment, they are only allowed to search for EWS documents, correct?*"

EWS's counsel rejected this Court's mandate to the district court's face:

> Ms. Adams: "*The data will all be collected . . . we do not have perfect knowledge as to what defendants have taken. And so in light of those broad search queries aimed at getting that information, that is what we will then be . . . searching.*"

> The Court: "*Yes.*"

> (ER 109-110.)

2

The district court understood the mandate. It articulated the mandate. Then it abandoned the mandate — on the record, in a single exchange.

Twenty-four hours later and fifteen hours before the next hearing, EWS served Appellant with approximately ~270 search terms and a twenty-page nonbinding forensic protocol — by email, at 7:00 p.m. Neither document was ever filed on the docket. The protocol disclaimed any binding force on the examiner. It contained no provision for the destruction of Appellant's personal data. The search terms included Appellant's own name, the word "privilege," the word "confidential," names of opposing counsel, and terms like "fraud," "conspiracy," "antitrust," and "greed" — while omitting the specific invention titles that constitute EWS's identified trade secrets. Among the ~270 terms was a trademark docket number — a public filing by definition. When Appellant objected, the court responded: "Well, maybe something related to it is a trade secret that you have." The district court adopted these materials over Appellant's objection, denied his request for time to review, and found him in contempt — without a single factual finding — imposing $1,000 daily fines beginning forty-eight hours later.

In discovery responses served after the contempt order, EWS made this admission:

> "*For the avoidance of doubt, EWS does not claim trade secret protection in the form of any of the aforementioned documents, but rather the underlying brand protection and business strategies reduced to writing within those documents*."

3

(ER 381.)

This Court's mandate authorized a forensic search for EWS's documents. EWS now says the documents are not its trade secrets — only the "strategies" and "concepts" within them. But a forensic imaging tool searches for files, not for ideas. If EWS disclaims the documents, then the mandate authorizes a search for nothing. There is nothing to image, nothing to compel, and nothing to hold Appellant in contempt for failing to produce. And what EWS now claims as trade secrets — Appellant's own professional knowledge and strategies — is precisely what the DTSA says cannot be enjoined. 18 U.S.C. § 1836(b)(3)(A)(i)(I).

**The sanctions order punishes Appellant for citing binding authority the court refused to analyze.** The district court imposed sanctions for a disqualification motion grounded in *Paradigm Insurance Co. v. Langerman Law Offices*, 200 Ariz. 146 (2001) — binding Arizona Supreme Court authority adopting Restatement (Third) § 51(3). The court denied the motion without addressing the three-element test, imposed sanctions while falsely claiming it had already "considered and dispensed with" *Paradigm*, and when it finally addressed the case seven months later, required an enumerated circumstance that *Paradigm* itself rejects. A motion grounded in binding authority and supported by a 28-paragraph factual declaration is the opposite of frivolous.

4

The district court's animus toward this motion was evident from the outset. Simultaneously with denying the motion, the court issued a sealed order (ER 485-491) referring Johnson to the State Bar—not for disclosing new information, but for **admitting in his motion** that he had previously disseminated the 'advice' in CLE presentations. The court twisted Johnson's own waiver argument (that the information was not confidential) into a confession of 'dereliction of duty' for disclosing it. This logical inversion—punishing Johnson for the very transparency that defeated the privilege claim—demonstrates that the sanctions were not an objective assessment of frivolity, but part of a concerted effort to penalize Johnson for his first defensive filing in the case. See *In re Itel Sec. Litig.*, 791 F.2d 672, 675 (9th Cir. 1986) (sanctions improper where motive is vindictive rather than corrective).

Both orders should be vacated.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1332 and 18 U.S.C. § 1836(c). This Court has jurisdiction under 28 U.S.C. § 1291 because the civil contempt order (ER 2) is a final, appealable order as to the sanctions imposed, or, in the alternative, under 28 U.S.C. § 1292(a)(1) as an order modifying an injunction. Appellant filed a timely notice of appeal within 30 days of entry of the contempt

order. See Fed. R. App. P. 4(a)(1)(A). The sanctions order (ER 21) is also before this Court as a collateral order.

## ISSUES PRESENTED

1. Whether the district court applied the wrong legal standard to the 'reasonable measures' element of EWS's trade secret claim, where the AUTSA requires the alleged secret to be 'the subject of' targeted protective efforts, the DTSA requires only general 'reasonable measures,' the court expressly disclaimed any findings on the enforceability of the employment agreements it cited as protective measures, and the remaining technical measures — the SharePoint architecture, the a read-only Excel password that did not restrict access to the Indices' contents, the permissions structure — were designed, built, and controlled by the very employee EWS accuses of misappropriation.

2. Whether the district court violated the mandate rule by endorsing a seizure of **"all data"** using **"broad search queries"** when this Court authorized only **"a forensic search for EWS's documents, narrowly tailored"**; whether EWS is judicially estopped from seeking broader relief than it represented to this Court in obtaining affirmance; whether the enforcement process—adopting unfiled protocols over objection, denying any opportunity to respond, and finding contempt without factual findings—compounded the violation; and

6

whether contempt is barred under *Taggart* where EWS has since disclaimed the documents themselves as trade secrets.

3. Whether the district court abused its discretion by imposing sanctions for a disqualification motion grounded in *Paradigm Insurance Co. v. Langerman Law Offices*, 200 Ariz. 146 (2001)—**binding Arizona Supreme Court authority adopting Restatement (Third) § 51(3)**—where the court imposed sanctions without ever analyzing the three-element test, then falsely stated it had already done so, and when it finally addressed *Paradigm* seven months later, required an enumerated circumstance that *Paradigm* itself rejects.

## STATEMENT OF THE CASE

### A. Background

Appellant Warren Johnson served as Senior Intellectual Property Counsel at Early Warning Services, LLC ("EWS") from 2014 to January 2023. During his nine-year tenure, Johnson built EWS's IP department, managing its innovation incentive program, patent prosecution, trademark portfolio, trade secret designation procedures, and all related employee training. (ER 441, ¶¶1–2.) Johnson operated with comprehensive authority under EWS's Signatory Authority Policy, executing contracts, settlements, and due diligence declarations on EWS's behalf. He executed powers of attorney at the United States Patent and Trademark Office granting authority to Bryan Cave Leighton

7

Paisner LLP ("BCLP") and Kilpatrick Townsend & Stockton LLP ("Kilpatrick")—the same firms now representing EWS in this litigation. (ER 446, ¶¶21–23.)

### B. The Preliminary Injunction and This Court's Mandate

On December 4, 2024, the district court granted a preliminary injunction requiring Johnson to provide "access to all digital electronic devices and media… that *may* include EWS's Confidential Information or Trade Secrets for forensic imaging." (ER 41-42.) (emphasis added) The order contained no search protocols, no limitation on the vendor's access, no privilege review process, and no identified search terms.

On appeal, EWS framed the dispute narrowly, telling this Court the case concerned only "(1) EWS's intellectual property indices… and (2) a screenshot of a… Microsoft Teams chat." (ER 319-320.) Relying on that narrow framing, this Court affirmed, stating the injunction authorized "a forensic search for EWS's documents, narrowly tailored in this context." (ER 160.) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).) The mandate issued July 23, 2025.

### C. The September 2025 Contempt Proceedings

At the September 22 hearing, the district court ordered EWS to email, by end of day Tuesday, a proposed protective order, proposed protocol, proposed

8

search terms, and a "brief description of how you propose the process go," scheduling "another hearing to discuss that on Wednesday." (ER 114:8–17.) Adams then requested permission to submit "brief briefing" to explain non-standard provisions in the protective order, which the court granted, assuring Appellant: "Mr. Johnson will have an opportunity to respond on Wednesday." (Id. at 20:3–4.) During this same hearing, EWS's counsel admitted the intended search was not narrow, stating "the data will all be collected" using "broad search queries." (Id. at 13:7–14:3.) The court endorsed this approach, responding "Yes." (Id. at 14:4.)

The court then announced: "I'm going to act very quickly." (Id. at 18:3.) In doing so, the court converted the imaging from what it had previously characterized as a "private search" exempt from Fourth Amendment constraints (ER 142) into a court-supervised process enforced by contempt—state action—without ever revisiting its prior ruling that Appellant's Fourth Amendment rights were "not relevant." (ER 197.) Appellant had argued on the record moments earlier that the court could not have it both ways: "If it's private, then contempt should be unavailable; if it's contempt, then the Fourth Amendment applies." (ER 104 : 16–18.) The court did not address this argument.[1]

---

[1] The court ruled on three separate occasions that the imaging was not state action and the Fourth Amendment did not apply. At the July 17, 2025 scheduling conference, the court denied Appellant's ER 160 motion in a single sentence: "The

At 7:00 p.m. on September 23—fifteen hours before the hearing—EWS emailed eight attachments directly to the judge's chambers and Appellant. Rather than the explanatory brief the court had authorized, EWS submitted a full motion for protective order, along with a twenty-page "Examination Protocols" document and approximately ~270 search terms. Among them were Appellant's personal trademark docketing numbers— —a system he developed long before joining EWS and used across multiple employers, meaning the search would inevitably sweep in files of Appellant's former clients unrelated to this case—as well as 'Mesa,' 'Zettle,' and the names of EWS employees and counsel.

---

protection afforded by the Fourth Amendment applies only to governmental actions. It's inapplicable to searches affected by private individuals." (ER 148.) On August 12, 2025, the court ruled in writing that the imaging "does not constitute state action" because the vendor "is not the government," and stated: "The Court must also note that it did not threaten Mr. Johnson with civil contempt." (ER 143.) at 1.) Yet at that same July 17 hearing — moments after denying Fourth Amendment protections — the court ordered the parties to discuss forensic protocols, initiating the court-supervised process it would later enforce through contempt. On September 22, the court formalized this by ordering EWS to draft protocols for judicial adoption, and on September 24, the court adopted those protocols as "an order of the Court" and held Appellant in contempt. The court took the enforcement power of state action while maintaining the constitutional posture of private action — precisely the contradiction Appellant identified on the record: "If it's private, then contempt should be unavailable; if it's contempt, then the Fourth Amendment applies." (ER 105 :16–18.) Under *Taggart*, these contradictory signals alone establish a "fair ground of doubt" barring contempt. 587 U.S. at 112.

Neither the protocols nor the search terms were filed on the docket. The protocols were emailed to chambers, bypassing CM/ECF entirely.

Appellant spent the intervening time preparing to discuss the protective order, as the court had directed. At the September 24 hearing, the court never reached the protective order discussion it had promised. Instead, it immediately adopted EWS's unfiled protocols and all ~270 search terms from the bench. (ER 133 :23–25.) Appellant told the court he had prepared for the wrong hearing: "I spent most of my time since last time we met was on the protective order. I guess I should have spent a little more time on this." (ER 132 :1–6.) When he asked whether the protocols would simply be adopted as-is without further review, the court replied: "No, you don't have an opportunity to. Prior to the contempt hearing on Monday, you could have worked with counsel on the search terms. Prior to today, you could have worked with counsel on the search terms." (ER 132 :7–10.) Appellant responded: "I attempted to." (ER 132 :11.) The court acknowledged that EWS had submitted a motion rather than the authorized brief but was unconcerned: "Well, it did explain it to the Court." (ER 136 –17.) The court then gave Appellant two weeks to respond to the protective order—the very document the hearing was supposed to discuss—while simultaneously adopting the protocols and search terms without any response period at all.

Minutes later, without making factual findings on willfulness or the clarity of the order, the court stated: "I do find that you are in contempt of the court order," and imposed a $1,000 daily fine. (ER 136:10–17.) The court's minute entry (ER 141) ordered Appellant to comply within forty-eight hours but never directed EWS to file the protocols or search terms on the docket. They remain unfiled to this day. The court's justification—that Appellant "could have worked with counsel on the search terms"—is contradicted by the record: the search terms did not exist until the court ordered their creation on September 22, and the court had acknowledged reading Appellant's July emails in which he repeatedly sought protocols from EWS. (ER 112 :9.)

### D. EWS's Discovery Disclaimer

In responses to Johnson's first set of written discovery, served after the contempt order, EWS made two critical admissions. First, it disclaimed the very documents the mandate authorized searching for: "For the avoidance of doubt, EWS does not claim trade secret protection in the form of any of the aforementioned documents, but rather the underlying brand protection and business strategies reduced to writing within those documents." (ER 381.) Second, asked to identify when and by whom the Indices were designated as trade secrets, EWS responded that its trade secrets "are designated as trade secrets automatically pursuant to company policy" because "this policy

designates trade secrets as such from their inception" and that "no specific individuals are responsible for first 'designating' a trade secret as such." (ER 382.) EWS has thus disclaimed the very documents that this Court's mandate authorized searching for — and admitted that no one at EWS ever made a deliberate decision to treat those documents as trade secrets in the first place.

### E. The Sanctions

Johnson filed a motion to disqualify BCLP and Kilpatrick, invoking the nonclient duty of care under Restatement (Third) of the Law Governing Lawyers § 51(3), as adopted by the Arizona Supreme Court in *Paradigm Insurance Co. v. Langerman Law Offices*, 200 Ariz. 146, 24 P.3d 593 (2001). The motion walked through each element of the § 51(3) test and was supported by a 28-paragraph declaration detailing nine years of collaboration, specific legal advice (including a recommendation against a trade-secret index), and the firms' access to Johnson's strategic thinking. (ER 595. [Dkt. 107])

On April 22, 2025, the district court denied the motion without addressing the three-element *Paradigm* test on the merits; the court's analysis focused entirely on whether Johnson was a former client under ER 1.9—an argument Johnson had never made. (ER 51 - 54].) Johnson moved for reconsideration, explicitly identifying the court's failure to address *Paradigm* and § 51(3). (ER 199- 201, 205.)

13

On June 30, 2025, the court denied reconsideration and simultaneously imposed sanctions under § 1927 and its inherent authority, characterizing the disqualification motion as one of many "unsuccessful, meritless maneuvers." (ER 18 – 19.) In doing so, the court misrepresented the record, stating that it had "already considered and dispensed with Mr. Johnson's arguments under the Restatement (Third) of the Law Governing Lawyers, In re Ockrassa, and Paradigm in its Order denying the Motion to Disqualify. (See ER 52 – 53.) That statement is demonstrably false: pages 4–5 of Dkt. 126 (ER 52 – 53) address only whether Johnson was a former client under ER 1.9 and do not mention *Paradigm*'s three-element test, quote § 51(3), or analyze any duty to nonclients.

Seven months later, on January 27, 2026, the court addressed *Paradigm* for the first time in a one-paragraph ruling on Johnson's motion to strike the Gibby Declaration. (ER 24.) Even then, the court did not apply the three-factor test. Instead, it quoted only the general rule that 'a professional owes no duty to a non-client' — omitting the remainder of the sentence, which states 'unless special circumstances require otherwise' — and concluded that '[n]either *Paradigm* nor the Restatement suggest that a special circumstance exists between a lawyer and his corporate client's former employee.' (ER 24.) The court never applied, or even acknowledged, the functional three-element test that *Paradigm* itself establishes.

14

The attorney whose disqualification Johnson had sought—Darin Gibby of Kilpatrick—was subsequently selected by EWS to file the declaration calculating Johnson's sanction amount. (ER 171 [Dkt. 189].) Johnson's disclosure of the trade-secret index advice was not merely non-privileged; it was expressly permitted under Arizona Ethical Rule 1.6(d)(5), which allows a lawyer to reveal otherwise confidential information "to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client." The district court dismissed this controlling ethical rule in a conclusory footnote, stating it "does not apply." (ER 491 n.3].)

## SUMMARY OF ARGUMENT

The contempt order must be vacated for two independent reasons. The separately appealed sanctions order must be vacated for a third.

**First**, the injunction rests on the wrong legal standard. The AUTSA requires that a trade secret be "the subject of efforts" to maintain its secrecy—a targeted nexus between the specific secret and the protective measure. The DTSA requires only general "reasonable measures." The district court collapsed these standards in a single sentence. Three federal circuits have held that generalized confidentiality infrastructure—company-wide NDAs, boilerplate handbooks, undifferentiated IT policies—cannot satisfy the UTSA's reasonable-efforts element when the plaintiff has done nothing to distinguish protection of the claimed secret from protection of

15

ordinary corporate information. *Opus Fund Servs.*, 2018 WL 1156246, at *7; *Turret Labs*, 2022 WL 701161, at 2; *Yellowfin Yachts*, 898 F.3d at 1299–1301. The Ninth Circuit's own methodology supports the distinction Congress's omission of UTSA language "evinces congressional intent" that the federal statute operates differently. *Attia v. Google*, 983 F.3d at 427–28, and *Quintara Biosciences*, No. 23-16093 (9th Cir. Aug. 12, 2025), both enforce textual differences between the DTSA and state UTSA rather than papering them over. The court's reasonable-measures finding rests on four categories: employment agreements, SharePoint permissions, a read-only Excel password, and an annual trade secrets course. (ER 34.) The employment agreements were never found to be enforceable — the court expressly disclaimed any findings on EWS's contract claims. (ER 29 at n.4.) The SharePoint architecture and the Excel password were designed, built, and controlled entirely by Johnson, not EWS. And the annual trade secrets course is a generalized corporate training program that does nothing to distinguish the claimed secrets from ordinary company information. Not one of these measures satisfies the targeted, secret-specific standard the AUTSA requires.

**Second**, the district court violated this Court's mandate. This Court authorized a "narrowly tailored" forensic search for "EWS's documents"—relying on EWS's own representation that the dispute concerned only two categories of documents. EWS then returned to the district court and sought the collection of "all

16

data" using "broad search queries." The court endorsed this expansion on the record, adopted an unfiled enforcement protocol that expressly disclaims binding force on the examiner, denied Appellant any opportunity to review or respond to ~270 overbroad search terms served fifteen hours before the hearing, and found Appellant in contempt without a single factual finding on willfulness, clarity, or ability to comply. EWS has since disclaimed the documents themselves as trade secrets—meaning the mandate now authorizes a search for nothing. Under *Taggart*, a party cannot be held in contempt for failing to produce material that the party seeking enforcement has abandoned.

**Third**, the sanctions order punishes Appellant for citing binding Arizona Supreme Court authority that the district court refused to analyze. The court imposed sanctions for a disqualification motion grounded in *Paradigm Insurance Co. v. Langerman Law Offices*, 200 Ariz. 146 (2001), which adopts a broad, three-element duty to nonclients under Restatement (Third) § 51(3). The court denied the motion without addressing the three-element test, imposed sanctions while falsely claiming it had already "considered and dispensed with" *Paradigm* on pages of its order that discuss an entirely different legal theory, and when it finally addressed *Paradigm* seven months later, demanded an enumerated circumstance that *Paradigm* itself expressly rejects. Under *Keegan*, a motion grounded in binding

17

authority and supported by a detailed factual declaration is neither baseless nor the product of an unreasonable inquiry. That is the opposite of frivolous.

## ARGUMENT

## I. THE INJUNCTION IS LEGALLY DEFECTIVE BECAUSE THE DISTRICT COURT APPLIED THE WRONG STATUTORY STANDARD AND FAILED TO IDENTIFY ANY VALID PROTECTIVE MEASURES UNDER EITHER FEDERAL OR STATE LAW

The district court's finding that EWS took "reasonable measures" suffers from two independent defects.

### A. The Court Applied the Wrong Standard Under Arizona Law.

The injunction order states that misappropriation is "analyzed similarly" under the DTSA and AUTSA. (ER 31.) That is incorrect as to the "reasonable measures" element. The AUTSA requires that a trade secret be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." A.R.S. § 44-401(4)(b). The DTSA requires only that "the owner thereof has taken reasonable measures to keep such information secret." 18 U.S.C. § 1839(3)(A).

The phrase "subject of" is not surplusage. It requires a targeted nexus between the specific alleged secret and the protective effort—the effort must be directed at the information claimed as a trade secret, not a generalized reference to all "confidential, trade secret, and privileged information." The AUTSA tracks the Uniform Trade Secrets Act, whose Official Comment enumerates

18

examples of reasonable efforts: "advising employees of the existence of a trade secret, limiting access to a trade secret on 'need to know basis,' and controlling plant access." Each example is secret-specific—advice keyed to the existence of *this* trade secret, access limitations calibrated to *who needs to know* it, controls guarding *this* information. The drafters did not endorse blanket confidentiality regimes untethered to the particular secret.

EWS's principal access-control measure illustrates the difference. The district court found that EWS "utilized a database only accessible on certain devices by persons with certain access permissions." (ER 34.) This refers to SharePoint, Microsoft's standard collaboration platform, which organizes documents into "team sites" with departmental-level permissions — the legal team site is accessible to legal department members, HR's site to HR, and so on. That is how every SharePoint deployment works at every company that uses it. It is not "limiting access to a trade secret on 'need to know basis'" as the UTSA Comment contemplates. The Comment's example envisions identifying specific information as a trade secret and then restricting access to those who need that particular information. Departmental SharePoint permissions do the opposite: they grant an entire department access to an entire document library regardless of whether any particular file in it a trade secret is. Johnson designed and built this SharePoint architecture himself, not at EWS's direction as a trade secret

19

protection measure, but as routine legal department infrastructure because the company had not built one. (See ER 255) A platform default that the accused employee created is not a "reasonable measure" under any reading of the statute.

The distinction is not academic. A growing body of federal authority holds that generalized confidentiality infrastructure cannot satisfy the UTSA's reasonable-efforts element when the plaintiff has done nothing to distinguish protection of the claimed trade secret from protection of ordinary corporate information. In *Opus Fund Services (USA) LLC v. Theorem Fund Services, LLC*, 2018 WL 1156246, at *7 (N.D. Ill. Mar. 5, 2018), the court dismissed a trade secret claim where the plaintiff had password-protected networks and employee confidentiality agreements but "did nothing to differentiate its protective measures for the alleged proprietary trade secrets from those imposed on any other corporate information." The Second Circuit has held that "what measures are 'reasonable' must depend in significant part on the nature of the trade secret at issue." *Turret Labs USA, Inc. v. CargoSprint, LLC*, 2022 WL 701161, at *2 (2d Cir. Mar. 9, 2022). The Eleventh Circuit affirmed summary judgment where the employer maintained general confidentiality expectations but permitted the employee to store data on personal devices and retain it post-separation—holding the plaintiff had "effectively abandoned all oversight in the

20

security of the Customer Information" despite its generalized corporate confidentiality posture. *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1299–1301 (11th Cir. 2018). And in *Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 902–10 (N.D. Ill. 2019), the court held that an employee handbook imposing general confidentiality obligations—but no post-employment restrictions and no targeted NDAs—was insufficient, calling the "failure to require those with access to its supposed trade secrets to enter into non-disclosure and confidentiality agreements" among "the most fundamental" shortcomings.

This case illustrates why the distinction matters. In discovery, EWS admitted that its trade secrets "are designated as trade secrets pursuant to EWS company policy upon their respective creation automatically by virtue of their content and level of confidentiality," and that "no specific individuals are responsible for first 'designating' a trade secret as such." (ER 378.) Under EWS's theory, any document touching on corporate strategy is "automatically" a trade secret from the moment of creation — no review, no designation, no deliberate protective action of any kind. That is precisely the regime the AUTSA's "subject of" language forecloses. If general confidentiality policies could retroactively convert any document into a trade secret, the "subject of efforts" requirement would be meaningless — every company has

21

confidentiality policies, and every document created under those policies would qualify. The AUTSA demands more: a deliberate decision to treat specific information as a trade secret, backed by protective efforts directed at that information. EWS has admitted no such decision was ever made.

The Ninth Circuit has confirmed that textual differences between the DTSA and state UTSA statutes must be respected, not collapsed. In *Attia v. Google LLC*, 983 F.3d 420, 427–28 (9th Cir. 2020), Congress's omission of UTSA language "evinces congressional intent" that the federal statute operates differently. *Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, No. 23-16093, slip op. at 5–6 (9th Cir. Aug. 12, 2025), held it was an abuse of discretion to import a state UTSA requirement into a DTSA-only claim because the statutory texts differ. The same logic runs in reverse: a district court equally errs by importing the DTSA's looser "reasonable measures" gloss into an AUTSA claim that textually demands the secret be "the subject of" specific efforts. By treating the AUTSA and DTSA standards as identical, the district court applied the wrong legal test to a necessary element of EWS's claim. Because the contempt order presupposes the validity of the injunction, this foundational legal error independently requires reversal. *Taggart v. Lorenzen*, 587 U.S. 106, 112 (2019).

**B. Even Under the DTSA, the Finding Is Unsupported.**

The only measures identified are employment agreements, company policies, SharePoint permissions, and an Excel password. (ER 34 - 35.) Each fails.

First, the contracts. The district court cited EWS's Employee Handbook and Intellectual Property and Confidentiality Agreement as evidence that EWS took "reasonable measures" to protect its trade secrets. (Dkt. ER 34 -35), citing Cheney Decl. ¶¶ 49–53.) But in footnote 4 of the same order, the court expressly disclaimed any findings on EWS's breach of contract claim, noting that EWS "only litigates its potential success on the trade secrets misappropriation claim" and that "this Order does not make any finding related to EWS's success on its breach of contract claim." (ER 29 n.4.) The court thus relied on the existence of contractual agreements as evidence of a "reasonable measure" while simultaneously refusing to determine whether those agreements were enforceable contracts at all. Johnson challenged the Employee Handbook as containing a non-contract disclaimer and the User Responsibility Agreement as a unilateral policy acknowledgment rather than a binding agreement. (ER 236 - 238.) EWS never rebutted these challenges. The court never resolved them. A court cannot credit a contract as a protective measure while disclaiming any analysis of whether it is a contract.

23

The absence of targeted efforts is confirmed by EWS's own discovery admissions. Asked to identify when the Indices were designated as trade secrets and by whom, EWS responded that its trade secrets "are designated as trade secrets pursuant to EWS company policy upon their respective creation automatically by virtue of their content and level of confidentiality," and that "no specific individuals are responsible for first 'designating' a trade secret as such." ( ER 382.) EWS went further, objecting that whether it "ever 'designated' EWS's trade secrets as trade secrets" is irrelevant to the legal standard. (ER 382.) This is a sworn admission that no person at EWS ever made a deliberate decision to treat the Indices as trade secrets. No review was conducted. No designation was made. The information simply existed, and EWS now claims it was "automatically" a trade secret by its nature. But the AUTSA does not protect information that *is* secret; it protects information that is "the subject of efforts" to *maintain* its secrecy. A.R.S. § 44-401(4)(b). An automatic designation requiring no human action is not an "effort." It is the absence of one.

Second, SharePoint permissions are a feature of the software platform, not targeted efforts directed at the Indices. Every SharePoint document has permissions; accepting this as a "reasonable measure" would make every document a trade secret. Moreover, Johnson's sealed performance reviews

24

document that he personally designed and built the SharePoint architecture, was granted administrative privileges to do so, and controlled the permissions structure—not as a targeted secrecy measure directed by EWS, but as part of routine IP department infrastructure. (See ER 640.)[2] EWS cannot claim as its own "reasonable measure" a system designed and controlled by the very employee it now accuses of misappropriation.

Third, the Excel password. The password on the Indices was an edit-protection password — it prevented modifications to the spreadsheet, not access to its contents. Any user could bypass it by clicking "Read Only" and view the Indices in their entirety. (ER 255 at ¶ 15.) This is not a secrecy measure; it is a version-control feature. Johnson designed it that way deliberately so that others in the legal department could reference the Indices without risk of altering the data. Moreover, the password was created and controlled solely by Johnson. EWS never possessed or knew it. (ER 253, 255 at ¶¶ 4, 14–15.) A password that does not restrict viewing, that was designed to facilitate access, and that was unknown to the trade secret owner is not a "reasonable measure" to maintain secrecy under any reading of either statute.

---

[2] (See Dkt. 52-1 [REDACTED] Johnson has moved to unseal these materials, and this Court may review them in camera.)

25

Fourth, even setting aside the failure of proof, the district court's trade secret finding is structurally unsound. The court relied on the Indexes to establish "existence" of a trade secret (ER 33-34.), the Teams Chat to establish "misappropriation" (ER 35 – 36.), and the $20,000 domain purchase to establish "value" and "damages" ( ER 36 -37.). Yet the court held the Teams Chat is not a trade secret (ER 35.), and the domain purchase reflects acquisition cost, not independent economic value from secrecy. A trade secret claim requires a single, identified secret to satisfy all elements. Assembling a claim from disparate items—none of which individually meets every requirement—is legal error.

EWS's own complaint confirms the absence of targeted measures. In pleading its AUTSA claim, EWS alleged only that it "engaged in efforts reasonable under the circumstances to keep EWS's Trade Secrets secret, including by requiring EWS's employees to execute and abide by agreements containing strict rules and requirements governing confidentiality." (ER 295 at ¶ 108.) This is a binding judicial admission. *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). The AUTSA demands more. It requires proof that the specific information claimed as a trade secret was "the subject of efforts" to maintain its secrecy. A.R.S. § 44-401(4)(b). A generalized, pre-employment NDA that applies to all company information cannot satisfy

26

this targeted, statutory requirement. *See Calisi v. Unified Fin. Servs., LLC*, 232 Ariz. 103, 106–07, 302 P.3d 628, 631–32 (Ct. App. 2013).

### C. The Error Requires Vacatur.

Because the injunction's likelihood-of-success finding rests on an unsupported reasonable-measures determination, the injunction is legally defective. The contempt order cannot stand. *Taggart v. Lorenzen*, 587 U.S. 106, 112 (2019).

## II. THE DISTRICT COURT VIOLATED THE MANDATE RULE AND JUDICIAL ESTOPPEL

### A. The Court Enforced a General Warrant, Not a Narrow Search.

A district court "must implement both the letter and the spirit of the mandate" and "may not expand or deviate from" it. *United States v. Thrasher*, 483 F.3d 977, 981–82 (9th Cir. 2007). This Court's mandate authorized "a forensic search for EWS's documents, narrowly tailored in this context." (ER 159.)

The progression of EWS's positions and the district court's rulings demonstrates the violation:

- **December 2024:** The district court orders forensic imaging of "all digital electronic devices and media and all electric mail and storage accounts" that "may include" EWS information. (ER 41 -42.)

27

- **January 2025:** On appeal, EWS defends the injunction as limited to "information and trade secrets contained in the Indices and Teams Chat," identifying only two categories of documents "relevant to this appeal." (ER 320 , 372.)

- **July 2025:** This Court affirms, describing the order as "narrowly tailored" and characterizing it as "a forensic search for EWS's documents." (ER 159.) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

- **September 22, 2025:** The district court confirms the narrow reading, asking EWS: "they are only allowed to search for EWS documents, correct?" EWS pivots: "the data will all be collected . . . broad search queries." The court: "Yes." (ER 108-110.)

- **April 2026:** The district court issued a further enforcement order that restates and enforces the original overbroad December 2024 injunction—imaging of 'all' devices and accounts 'including all metadata'—despite the narrower mandate. (ER 43.)

The court articulated the correct standard—a search for "EWS documents"—then endorsed its opposite—collection of "all data" using "broad search queries." The mandate authorized a search for specific documents, not a dragnet through Appellant's personal data based on EWS's admitted lack of

28

"perfect knowledge." *Thrasher*, 483 F.3d at 981–82. The district court's own question—'they are only allowed to search for EWS documents, correct?'—framed the correct standard. Moments later, the court accepted precisely the opposite approach. (ER 109 -110.)

## B. EWS Is Judicially Estopped from Seeking Broader Relief Than It Represented to This Court.

Under *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001), judicial estoppel bars a party from asserting a position "clearly inconsistent" with one it successfully advanced in an earlier proceeding when the party would derive an unfair advantage.

All three elements are met. Before this Court, EWS asserted that the 'documents relevant to this appeal are: (1) EWS's intellectual property indices… and (2) a screenshot of a… Microsoft Teams chat.' (EWS Appellee Br., DktEntry 25.1 at 11–12.)  This Court relied on that framing in affirming. EWS then returned to the district court and sought to collect "all data" using "broad search queries"—the opposite of what it represented on appeal.

The September 22 hearing captured this reversal in real time. During opening remarks, Appellant raised the estoppel argument. The court stopped him and asked him to elaborate, which he did (ER 104.). The court did not engage with the legal argument. Instead, it asked whether there was anything it

29

could do to obtain compliance, to which Appellant responded that he wanted his constitutional protections. When Appellant confirmed that the search should be limited to what EWS argued before the Ninth Circuit, the court responded: "everybody else thinks that except you (ER 110.) The court then posed the constraining question that flowed directly from the estoppel argument: "they are only allowed to search for EWS documents, correct?" (ER 110.) EWS rejected the limitation. The court accepted EWS's contradictory position within minutes of articulating the constraint itself. The court later adopted that contradictory position as the Forensic Imaging Order on September 24, forming the sole basis for holding Appellant in contempt. (ER 132 -133.)

### C. The Process of Enforcing the Mandate Compounded the Violation.

At the September 24 hearing, Appellant identified search term '22-001' as his internal trademark docketing number—information that is inherently public. The court acknowledged that 'the trademark itself might not be [a trade secret],' but then reasoned that 'documents related to things around the trademark' might be, and 'you'll have an opportunity to object.' (ER 129 - 130.) That exchange is a microcosm of the enforcement order.

Similarly, the list included 'Zettle,' a third-party payments company purchased by PayPal, which bears no relationship to any trade secret EWS has identified. It included 'Mesa'—the city of the high school that EWS baselessly

30

asserted Appellant attended, transparently aimed at bolstering its own collusion narrative. Terms like these confirm the search was not a targeted retrieval of EWS documents but a general warrant through Appellant's digital life.

Appellant immediately identified the numbers as his own docketing system—the same system he developed before joining EWS and used at previous employers. (ER 129 : 22-25.) The numbers were not EWS trade secrets; they were Appellant's personal organizational tool, portable across jobs. By adopting them as search terms, the court authorized rummaging through documents organized by a system Appellant himself created, looking for anything tangentially related to EWS.

Because **Appellant used the same docketing system for prior employers**, those numbers also correspond to files of former clients—clients whose attorney-client privilege could be breached by a forensic search that sweeps in everything bearing those identifiers. The district court's order thus authorized not just a general warrant into Appellant's personal life, but a potential violation of third-party confidences that have nothing to do with EWS.

The process that produced this result ensured the overbroad scope would be adopted without scrutiny. On September 22, the court ordered EWS to draft enforcement protocols and scheduled "another hearing to discuss" them. (ER 115 -116.) At 7:00 p.m. the following evening—fifteen hours before that

31

hearing—EWS served Appellant with a twenty-page *non-binding* technical protocol and approximately ~270 search terms. Neither document was ever filed on the docket. The protocol's opening paragraph reserved discretion: 'the Examiner is not required to perform any specific procedures beyond standard legal and forensic obligations.' (ER 69 - 80 (Protocol Overview).) Thus, the order threatens contempt for failure to comply with a protocol that leaves the examiner's precise actions to their own judgment and fails to state its terms with the specificity required by Rule 65(d).

At the September 24 hearing, the court adopted the unfiled protocols from the bench: "So I am adopting the proposed examination protocols as an order of the Court." (ER 131.) When Appellant requested time to review the materials, the court refused: "No, you don't have an opportunity to." (ER 131 - 132.) The court then found Appellant in contempt. Its entire ruling: "I do find that you are in contempt of the court order." (ER -133.) No findings on willfulness, clarity, or ability to comply. A civil contempt order requires factual findings sufficient to permit appellate review. *Stone v. City & County of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992). The order here contains none.

The protocol itself raises independent concerns under Federal Rule of Civil Procedure 65(d), which requires that an injunction "state its terms specifically." An enforcement order that was never filed on the docket and

32

expressly disclaims binding force on the examiner does not satisfy this standard. The court is threatening Appellant with incarceration for failing to submit to a protocol that, by its own terms, binds no one.

The remaining search terms confirm the pattern. On September 22, EWS's counsel described the search as involving "broad search queries" because EWS lacked "perfect knowledge." (ER 110-111.) On September 24, EWS called those same terms "narrowly tailored," arguing that words like "confidential" and "privileged" are standard industry vocabulary on the types of documents at issue. (ER 126.) The argument defeats itself: if these terms are standard vocabulary across a vast range of business documents, searching for them will capture enormous volumes of material having nothing to do with EWS. Terms like "confidential," "privileged," "trade secret," "bank," "metadata," "fraud," "conspiracy," and "mesa" would match virtually every document on any device used by any attorney in intellectual property or financial services.

## D. EWS Has Admitted There Are No "EWS Documents" to Search For.

The mandate violation is compounded by EWS's own admission in discovery:

> "EWS does not claim trade secret protection in the form of any of the aforementioned documents, but rather the underlying brand protection and business strategies reduced to writing within those documents." (Ex. __, EWS Resp. to Interrogatory No. 1(a).)

33

This is structurally fatal. This Court authorized a forensic search for "EWS's documents." EWS now disclaims the documents and claims only abstract "strategies and concepts" within them. A forensic imaging tool searches for files, not ideas. If EWS disclaims the documents, the mandate authorizes a search for nothing, and there is nothing to hold Appellant in contempt for failing to produce.

At minimum, EWS's disclaimer creates the "fair ground of doubt" that bars civil contempt under *Taggart v. Lorenzen*, 587 U.S. 106, 112 (2019). When the party that obtained the order disclaims the very category of material the order authorized recovering, that is not merely a fair ground of doubt—it is the elimination of the order's operative premise.

### E. The Contempt Finding Rests on a Factual Premise the Court Knew Was False.

The court's minute entry justified contempt by stating Appellant "should have worked with counsel on the search terms." (ER 141.) This is demonstrably false. Throughout July 2025, Appellant sent repeated emails to EWS requesting search protocols and "Fourth Amendment type protections." EWS refused to respond. Two days before the contempt finding, the court expressly acknowledged reading these emails on the record. (ER 114.) A contempt order

predicated on a factual finding the court knows to be contradicted by the record cannot stand.

## III. THE SANCTIONS ORDER MUST BE VACATED

### A. Standard of Review

The legal conclusion that a filing is sanctionable is reviewed de novo. *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 828 (9th Cir. 1986). A motion is sanctionable only if it is "both baseless and *without* a reasonable and competent inquiry." *In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 434 (9th Cir. 1996) (emphasis in original). The district court's finding that Johnson's disqualification motion was frivolous is a legal conclusion subject to de novo review—and it is demonstrably wrong.

### B. *Paradigm* Establishes a Broad, Fact-Based Duty to Nonclients

Johnson did not claim to be a client; he argued he was a nonclient owed a duty under Restatement § 51(3), which *Paradigm* adopted. The test is whether:

(a) the lawyer knows that a client intends as one of the primary objectives of the representation that the lawyer's services benefit the nonclient;

(b) such a duty would not significantly impair the lawyer's performance of obligations to the client; and

(c) the absence of such a duty would make enforcement of those obligations to the client unlikely.

35

*Paradigm*, 200 Ariz. at 152 ¶ 24. Critically, *Paradigm* rejected any requirement that the nonclient's situation match a pre-existing enumerated example. It expressly disapproved of *Franko v. Mitchell*, 158 Ariz. 391 (1988), and held that the "common thread" is "a foreseeable risk of harm to a foreseeable non-client whose protection depended on the actor's conduct." 200 Ariz. at 155-56. The duty does not depend on a label; it depends on the three factors.

### C. Johnson's Motion Applied the Three Factors to Undisputed Facts

Johnson's motion walked through each factor. He showed that EWS retained the firms to advise him as its sole IP counsel, making him the intended beneficiary of the representation (element a); that a duty not to misuse his confidences would not impair the firms' representation of EWS (element b); and that without such a duty, EWS could not hold the firms accountable for advice it received through Johnson (element c)—the same "gap in accountability" that *Paradigm* itself recognized. 200 Ariz. at 154 ¶ 23. The motion was supported by a detailed declaration.

### D. The District Court Never Analyzed the Three Factors—Then Imposed Sanctions

As recounted above, the court denied the disqualification motion without addressing the § 51(3) test. It then denied reconsideration and imposed sanctions, falsely stating that it had "already considered and dispensed with" Johnson's

36

*Paradigm* arguments in its prior order — when it plainly had not. Seven months later, it finally mentioned *Paradigm*, but only to quote the general rule that "a professional owes no duty to a non-client." (ER 23.) It stopped there. But that is only a single, qualified clause of the Court's full sentence/thought. The full passage from *Napier v. Bertram*, which *Paradigm* quoted with approval, reads:

"***although the*** 'general rule is that a professional owes no duty to a non-client ***unless special circumstances require otherwise,' there are 'special circumstances' where we have 'imposed liability on a professional to the extent that a foreseeable and specific third party is injured by the professional's actions.***'" *Paradigm* Ariz. at ¶27.

After surveying those cases, the Arizona Supreme Court identified the "common thread": "***there was a foreseeable risk of harm to a foreseeable non-client whose protection depended on the actor's conduct***." *Paradigm*, 200 Ariz. at 155–56. The court then adopted the Restatement § 51(3) three-element test to operationalize that principle. *Id.* at 152, ¶ 24.

The district court quoted the general rule and deleted the exception. It then concluded that "[n]either *Paradigm* nor the Restatement suggest that a special circumstance exists between a lawyer and his corporate client's former employee" — imposing the very categorical limitation that *Paradigm* rejected when it

37

disapproved *Franko v. Mitchell*. A sanctions order predicated on half a quotation and a legal standard the governing case expressly repudiated cannot stand.

### E. The Motion Was Not "Baseless" Under Keegan

A motion that invokes binding Supreme Court precedent, quotes the Restatement, and applies a three-factor test to specific documented facts is not "baseless." Even if this Court were to disagree with Johnson's reading of *Paradigm*, a good-faith argument for the extension of existing law is not objectively unreasonable. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). Johnson's 28-paragraph declaration demonstrates more than a reasonable inquiry. The district court's contrary holding is legal error and must be reversed.

### F. Conclusion

The district court imposed sanctions without analyzing the governing legal standard, misrepresented the record to justify its ruling, and—when it finally addressed *Paradigm*—applied a categorical bar that *Paradigm* itself rejected. Under *Zaldivar* and *Keegan*, the sanctions order (ER 21 [Dkt 335].) must be vacated.

## CONCLUSION

For the foregoing reasons, Appellant Warren Vurl Johnson respectfully requests that this Court:

1. VACATE the contempt order (Dkt. 243);

2. TERMINATE the accruing coercive sanctions;

3. VACATE the sanctions order (Dkt. 335);

4. REMAND with instructions that (a) any forensic examination protocol conform strictly to this Court's mandate for a "narrowly tailored" search for "EWS's documents"; (b) Appellant receive constitutionally adequate notice and a meaningful opportunity to be heard before any contempt finding.

Respectfully submitted,


/s/ Warren V. Johnson


Warren V. Johnson
215 E 18th St
Lawrence, KS 66044
(208) 371-1686
warrenvjohnson@gmail.com
*Appellant, Pro Se*

39

## CERTIFICATE OF COMPLIANCE

I am the self-represented appellant. This brief complies with the type-volume limitation of Ninth Circuit Rule 32-1. This brief contains approximately **8,393** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).


/s/ Warren V. Johnson

Date: __April 24, 2026_____

## CERTIFICATE OF SERVICE

I, Warren V. Johnson, hereby certify that on __April 24, 2026____, I electronically filed the foregoing Appellant's Opening Brief with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Warren V. Johnson

Warren V. Johnson
215 E 18th St
Lawrence, KS 66044
warrenvjohnson@gmail.com

41